MICHELLE R. BURROWS OSB 861606
Michelle R. Burrows PC
1333 NE Orenco Station Pkwy. Ste. 525
Hillsboro, OR 97124
Telephone: 503-241-1955
Michelle.r.burrows@gmail.com

      Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Pendleton Division

| | | |
|---|---|---|
| NATHAN WAYNE GALLOWAY | ) | |
| | ) | No. 2:18-cv-00923-JO |
| Plaintiff, | ) | FIRST AMENDED COMPLAINT |
| | ) | |
| | ) | Failure to timely provided medical care 42 |
| v. | ) | USC 1983; 8th Amendment |
| | ) | |
| GARTH GULICK, ASHLEY CLEMENTS, | ) | |
| STATE OF OREGON, JOHN DOES 1-5, | ) | |
| | ) | |
| Defendants. | ) | |

**INTRODUCTION**

1.

This litigation concerns the failure to timely diagnose, treat and care for Plaintiff's

serious deteriorating spinal condition despite repeated requests for treatment. Plaintiff was

injured in 2006 and over the course of several years, and continuing through the present, ODOC

and defendants failed to treat or care for Plaintiff's condition. Plaintiff is losing feeling and

control in his extremities, requires additional surgeries, and requires assistance walking and with

daily care.

**JURISDICTION**

2.

This court has jurisdiction over Plaintiff's claim of violations of federal Constitutional

Rights under 28 U.S.C. §§ 1331 and 1343.

3

Venue is proper under 28 U.S.C. § 1391(b), in that one or more of the defendants reside

in the District of Oregon and Plaintiffs' claims for relief arose in this district.

4.

Plaintiff is entitled to his attorney fees pursuant to 42 U.S.C. § 1988.

5.

**PARTIES**

6.

Plaintiff is presently incarcerated at the Oregon State Penitentiary, but has been

incarcerated within the Oregon Department of Corrections throughout the events alleged in this

litigation. Plaintiff has fully exhausted all administrated remedies required by the PLRA.

7.

Defendant Garth Gulick was at all times relevant an employee of the Oregon Department

of Corrections and employed as a physician at Snake River Correctional Institution. Defendant

Gulick was the primary care physician for Plaintiff during most of the events alleged herein. At

all times relevant, Defendant Gulick was acting under color of law and is sued in his individual

capacity.

8.

Defendant Ashley Clements was at all times relevant a contract medical provider working

for the Oregon Department of Corrections. Ms. Clements provided medical services to Plaintiff

during most of the relevant time alleged herein. Ms. Clements is sued in her individual capacity

and was at all times working under color of law.

## FACTUAL BACKGROUND

### 9.

In 2006 Plaintiff injured himself lifting weights at SRCI. He was treated by Defendant Gulick who diagnosed a "pulled muscle" and administered a shot into Plaintiff's lower back. After a year of Plaintiff's complaints and requests for medical care, Defendant Gulick submitted a request to the Therapeutic Levels of Care Committee (TLC) which approved an MRI of the back in 2007. Dr. Gulick advised Plaintiff the MRI indicated no abnormalities. This was false. The MRI revealed protruding discs which should have alerted Dr. Gulick to take additional diagnostic steps.

### *2006-2010 SRCI*

### 10.

In 2009, Plaintiff began to experience serious testicular pain and discomfort including difficulty with urination and numbness in the right leg. Medical staff refused to provide any additional testing or treatment for the advancing symptoms. In 2009 to 2010, a study was conducted showing possible nerve sensation and damage to the right testicle. Between 2007 and 2010, Dr. Gulick refused to provide any treatment to Plaintiff for his increasing and ongoing symptoms related to the back injury, despite the adverse findings in the 2006 MRI. Dr. Gulick and Nurse Manager Clements refused to send Plaintiff to a specialist or to provide any additional treatment or pain management beside Naprosyn.

### *2011*

### 11.

Defendant Clements reported that Dr. Bristol had administered steroids and Lortab for pain and was to be seen April 6, 2011. Dr. Blakeslee reviewed Plaintiff's treatment on April 6, 2011 and referred his case to the TLC .

12.

On April 20, 2011, Plaintiff was seen by Dr. Blakeslee who administered lidocaine and Kenalo into the right sciatica joint. Plaintiff experienced approximately two hours of relief.

13.

By April 22, 2011, Plaintiff had developed an S curve in his back and was unable to straighten up. Plaintiff required a wheelchair for mobility. By April 23, 2011, nurses in medical administered Norco, Prednisone and Valium to Plaintiff for pain management.

14.

On April 24, 2011 Plaintiff developed serious bowel and bladder function restrictions. He was scheduled for another MRI but it was not scheduled for an additional month and Plaintiff was not provided the results of the MRI until May 13, 2011.

15.

Commencing May 12, 2011, Plaintiff developed shingles which increased the pain from his spine, his testicles and made his urination difficulties more severe.

16.

On May 18, 2011, Defendant Clements finally revealed that the May MRI showed L-5 and S-1 protrusions such that the right nerve root was being compressed. Plaintiff's L4 and L5 also had protrusions. Defendant Clements recommended Plaintiff be seen by a neurosurgeon and indicated that they would take whatever action was recommended by the neurosurgeon.

17.

On May 19, 2011, Plaintiff's pain was so severe that he had difficulty standing and at one point his back "slipped out" and Plaintiff's right leg gave out causing Plaintiff to fall and strike his head. He was not seen by medical for this fall or the symptoms from the back despite his request for treatment.

18.

Plaintiff's pain was increasing in his back and testicles and he also developed open sores from the shingles. He was refused pain medication June 3-7, 2011. On Jun 7, 2011, Dr. Bristol noted significant reflex responses between the right and left legs, and ordered a wheelchair pusher for Plaintiff.

19.

On June 16, 2011, Plaintiff was refused pain medications and was transported to see Dr. Zimmerman, an outside neurosurgeon. The examination revealed deficits in reflexes and decreased strength in the right leg. Dr. Zimmerman reported to Plaintiff he had a severely damaged S-1 disc and compression of the S-1 nerve which required surgery to cut away the pressure from the nerve. There was no other choice of treatment recommended to Plaintiff.

20.

On June 21, 2011, Dr. Bristol contradicted Dr. Zimmerman's diagnosis. Plaintiff requested the surgery recommended by Dr. Zimmerman and approved by TLC. By this time, Plaintiff's condition had progressed so severely he could no longer urinate on his own and required catherization on July 10, 2011 (625 cc urine) and July 13, 2011 (1200 cc and 1600 cc urine). Plaintiff was refused catherization as needed thereafter for unknown reasons.

21.

On August 15, 2011, Dr. Zimmerman performed a laminectomy, micro discectomy for the herniated discs. The next day Plaintiff was returned to SRCI with orders not to lift or bend and to return for follow up in 7-10 days. Plaintiff was prescribed a back brace. Four days later Plaintiff fell down when his leg collapsed. He was completely unable to urinate or to perform bowel movements after the fall and was catharizing himself 2-4 times daily. He noticed bleeding

on his back brace. Medical staff was titrating Plaintiff from his pain medications during this time period.

22.

When Plaintiff fell down his unit officer, McMurry, called medical speaking with Nurse Tucky who refused to permit Plaintiff to come to the medical unit and simply told Plaintiff to lie down on his bunk until the next day. The next day Nurse Wilcox noted that the incisions from the surgery had broken apart and it appeared Plaintiff was leaking spinal fluid. She ordered Plaintiff be transported to the hospital immediately as an emergency. Defendant Gulick denied this request and Plaintiff was returned to his housing unit with no further treatment.

23.

By August 30, 2011, Plaintiff had not been seen by Dr. Zimmerman and had not had a dressing change on his back for seven days. Plaintiff was refused antibiotics by Dr. Gulick. Plaintiff also had developed foot drop and could not walk easily without falling.

24.

On August 26, 2011, Dr. Zimmerman's office reported learning about the leaking in the back and had requested Plaintiff be returned to his office for examination. Defendant Gulick refused.

25.

Between August 26, 2011 and September 8, 2011, Plaintiff's leg collapsed more than once. He was seen by Dr. Zimmerman on September 15, 2011. By this point defendants had removed Plaintiff from all pain medications. Dr. Zimmerman noted that the internal stitches were now on the outside of the body. Dr. Zimmerman noted that because ODOC failed to return

Plaintiff for a timely follow-up, his surgical wound had healed from the outside in, causing layers of scar tissue.

26.

Between September 15, 2011 and October 29, 2011, Plaintiff reported increased pain and symptoms but he was refused all treatment by medical staff specifically Dr. Gulick. On November 1, 2011, another MRI with and without contrast was ordered. This December 2, 2011 MRI indicated a second surgery is now required.

27.

Plaintiff was prescribed new pain medications but on December 31, 2011 Plaintiff fell again because of his deteriorating back.

*2012*

28.

Plaintiff had a second surgery on March 6, 2012. Plaintiff was titrated from pain meds but was not allowed to see a provider for an examination between March 8, 2012 and March 9, 2012. Plaintiff was advised by the hospital at the time of the March 2012 surgery that his fasting blood sugar was 138. He was refused copies of the hospital records from his surgery. Plaintiff was required to use a cane in order to walk around the prison.

29.

Plaintiff was overdosed with morphine by staff.  Plaintiff had a severe allergic reaction including continuous vomiting. He was titrated from morphine between March 30, 2012 and May 1, 2012. He was denied Neurontin renewal between May 7, 2012 and June 18. He was refused access to medical between May 17, 2012 and June 25. He continued to complain of weakness, numbness in his extremities, extreme pain and difficulty with urinating.

30.

On August 9, 2012, Plaintiff was seen by outside provider Dr. Eric Uhlman, a urologist, to address the incontinence issues. Dr. Uhlman advised Plaintiff that his back problem created serious urinary problems which would likely be lifelong in nature. Dr. Uhlman conducted objective testing which resulted in Plaintiff's ability to only void 10cc of urine in his bladder with 90 cc remaining. Dr. Uhlman requested Plaintiff be scheduled for additional testing and advised Plaintiff he should continue to catharize to protect kidney function. Any retention of urine can result in hydro nephrosis of the kidneys.

31.

On September 20, 2012, Dr. Uhlman conducted a follow-up evaluation of Plaintiff's urinary problems. Dr. Uhlman conducted a cysto-flow test that revealed no blockages but did show retention of urine. Dr. Uhlman opined the retention was a result of the back injury and possibly related to delay of surgery and treatment of the initial back injury. Dr. Uhlman opined Plaintiff will need to catharize the remainder of his life.

32.

Between October 13, 2012 and November 15, 2012, Plaintiff was repeatedly denied access to catheters and made to appear in medical for catheterizations. On November 15, 2012, Dr. Bristol advised Plaintiff he would require a reconstruction surgery of his back and "insertion of a new disc".

*2013*

33.

Between January 3, 2013 and April 17, 2013, Plaintiff suffered from increasing testicular pain and had constant spasms in his back making it impossible for him to walk or to function. He was required to catheterize in his cell every 3-4 days.

34.

On May 9, 2013, Plaintiff was examined by Dr. Bristol who realized the failure to schedule a follow-up evaluation with Dr. Uhlman but did not schedule it until he had approval from TLC and another MRI was conducted. The TLC approved the MRI which was conducted on June 14, 2013.

35.

Plaintiff reported ongoing pain issues, spasms, testicular pain and requests for pain management from Dr. Bristol and Dr. Gulick. Plaintiff was advised his case is to be reviewed by the TLC on July 3, 2013 regarding a follow-up appointment with Dr. Zimmerman.

36.

Between June 20, 2013 and June 27, 2013, Plaintiff reported increased intensity of pain, with the numbness spreading into his feet until finally his pain rendered him incapacitated such that a security officer on Plaintiff's housing unit took him to medical. Dr. Gulick only ordered prednisone and Vicodin, noting increased swelling in the back and that catheterizations had increased to 2 times daily.

37.

By June 29, 2013, Plaintiff reported to medical he could no longer use his foot but had to drag it. By July 26, 2013, Plaintiff's back was no longer able to hold him upright. Dr. Bristol reported to Plaintiff that Dr. Zimmerman said nothing could be done for Plaintiff but agreed to see him again in several weeks or even months' time. From this point on, Plaintiff had lost all

feeling in his right leg and foot. He also began receiving urges to defecate constantly. His right

foot lost all strength and ability to be used.

38.

On August 22, 2013, Dr. Bristol advised Plaintiff he would not be able to see Dr.

Zimmerman for months and that all pain medications were going to be stopped. Plaintiff asked to

see Dr. Zimmerman and Dr. Uhlmann but was denied.

39.

By October 2, 2013, Plaintiff had developed kidney stones which would be monitored.

On October 3, 2013, Plaintiff was finally seen by Dr. Zimmerman who advised Plaintiff that the

last MRI showed a fragmented disc at L4 and L5, a piece of which was pressing on the nerve and

creating the numerous serious symptoms being suffered by Plaintiff. Dr. Zimmerman,

contradicting earlier reports by Dr. Bristol, reported that the pain suffered by Plaintiff is being

caused by the disc and nerve problems evidenced on the MRI and that his problems must be

addressed soon. Dr. Zimmerman recommends a third surgery.

40.

On November 4, 2013, Plaintiff's right leg once again gave out and Plaintiff collapsed,

unable to stand up, and was taken to the medical unit. Dr. Bristol told Plaintiff he did not know

what to do for his condition, gave him a wheelchair, a cane and Norco for five days.

41.

On November 12, 2013, Plaintiff had his third back surgery as a result of the initial

injury. Plaintiff's recovery was slow. This surgery was delayed nearly seven months and was to

be a fragment break repair. Dr. Zimmerman noted the fragment had migrated and damaged

Plaintiff's L-5 and S-1. Dr. Zimmerman corrected the damage to L-4 and L-5, did a patch on L-5 and S-1 in preparations for a 4th surgery.

*2014*

42.

On January 9, 2014, Plaintiff reported to Zimmerman that he was experiencing more difficulty urinating. Dr. Zimmerman ordered an immediate CT scan but the prison medical officials failed to schedule it noting only that it "must have gotten lost in the chart". Plaintiff was no longer able to void his bladder or have bowel movements on his own and now had further compromised motor skills on his right side.

43.

On February 21, 2014, Plaintiff had a CT scan but Dr. Bristol advised him "there is nothing wrong". Plaintiff was scheduled to see Dr. Zimmerman. Plaintiff was denied a return visit with Dr. Zimmerman but was told by Dr. Bristol and one additional medical provider that the CT scan showed information to explain his ongoing medical condition but they refused to tell Plaintiff what the CT scan showed.

44.

On March 6, 2014, despite objective testing showing serious deteriorating medical condition and nerve damage, Dr. Bristol denied Plaintiff any pain medications advising him "you will just have to deal with it". On March 14, 2014, Dr. Bristol advised Plaintiff they will not do any further surgeries no matter what is recommended by the outside specialists.

45.

On April 10, 2014, Plaintiff is seen by Dr. Zimmerman who advised Plaintiff needed further surgery or the symptoms would continue to worsen. Dr. Zimmerman advised against a

fusion but showed that a fusion will alleviate the pain. Dr. Zimmerman discussed the CT scan

from February demonstrating that there was significant scar tissue built up on the L-5/S-1.

46.

On March 24, 2014, Dr. Gulick advised Plaintiff will be given no pain medication

because Plaintiff has "chronic nerve pain". Dr. Zimmerman ordered pain medications but was

reversed by Dr. Gulick and Dr. Sheldon, the Oregon Medical Services Director.

47.

On April 24, 2014, TLC approved surgery for Plaintiff to be done soon. ODOC never

scheduled the surgery.

48.

Plaintiff won a new trial effort on an appeal of his convictions. He was returned to Crook

County in May 12, 2014 to be retried. ODOC transferred Plaintiff to Crook County without any

medication, chart, catheters or any other information. Crook County had to immediately transfer

Plaintiff to the Emergency Department to address the serious medical issues which arose because

of ODOC's failure. Plaintiff was told he needed the fourth surgery immediately and that failure

to perform this fourth surgery quickly would result in the symptoms becoming permanent. This

was verified in a medical evaluation conducted by Medical Resource Network as part of

Plaintiff's criminal defense in the new trial.

49.

Plaintiff was eventually seen by Dr. Mark Belza at the Bend Spine and Neurosurgery

who ordered and conducted an MRI on June 14, 2014. Dr. Beamer noted there were no back

problems with Plaintiff, removed all medications and catheters and found "no surgery is

needed".

50.

On July 14, 2014, Plaintiff was seen by Dr. Belza in Bend who advised the foot drop was due to pain in the back and leg. Dr. Belza determined the pain had to be controlled and it was his belief the urination problem arose from a surgical error. Dr. Belza and medical staff made adjustments to Plaintiff's medication regime.

51.

Between July 16, 2014 and August 13, 2014 Plaintiff is seen by Dr. Belza, Dr. Beamer, Dr. Tien, Dr. Jack Brewer.

a.  Dr. Belza opined additional surgery at that time would cause greater damage and he wanted to work on pain management to improve the foot drop and urination issues.

b.  Dr. Beamer opined that the neurological tests show serious weakness in the leg.

c.  Dr. Tien did a nerve conduction test indicating that the weakness in right leg and foot drop is due to pain. Dr. Tien said there should be no more surgery and that evaluation showed a mass of scar tissue on the nerve and that Plaintiff had a high risk of requiring some surgery to remove the scar tissue. Dr. Tien also opined better pain management would address some of the more serious symptoms. Dr. Tien ordered an artificial foot orthotic to help Plaintiff with walking and to reduce the risk of tripping on the disabled right foot.

d.  Dr. Brewer opined the urination problem is a result of the original back injury; hypotonic neurogenic bladder. Dr. Brewer noted that the nerves are not responding in the bladder and advised Plaintiff to catheterize more often.

52.

Despite clearly written notes by Dr. Tien, Dr. Beamer denied any changes in medication and blamed the urination problem on some alleged methamphetamine use despite the fact Plaintiff had been in prison for 12 years and had not used illegal drugs. Dr. Beamer provided false and misleading information to Plaintiff on the findings by Dr. Tien and the other outside professionals. The jail nurses commented that Dr. Beamer just does not care.

53.

Dr. Beamer was caught committing crimes regarding medication in September 25, 2014 and lost his hospital privileges. He confronted Plaintiff about the information Plaintiff provided to other medical providers and then dropped Plaintiff's dosage of pain meds in contravention of what was recommended by other doctors. This increased Plaintiff's pain.

*2015-2016*

54.

Plaintiff returned to ODOC custody. He was housed at SRCI.  Dr. Gulick maintained some of the medications ordered and implemented by CCCF at intake but advised Plaintiff much of the pain management meds would be removed soon. Dr. Gulick told Plaintiff that because Plaintiff "opted" to go to trial he had in effect "refused" the fourth surgery and would be refused all further treatment of his back issue as a "medical refusal" inmate. Dr. Gulick advised Plaintiff that ODOC does not treat inmates for chronic pain and terminated all further pain management treatment.

55.

Dr. Gulick approved a foot brace to assist Plaintiff with his foot drop but Dr. Shelton reversed this and Dr. Gulick took no steps to provide care to his patient. On June 5, 2016, Plaintiff was approved for a foot brace and special shoes. He was denied pain medication.

56.

On June 12, 2016, plaintiff developed a foot sore on his right foot where he wore his foot

brace. The sore burst. Plaintiff could no longer feel his feet due to the ongoing back problems.

Dr. Hemphill advised Plaintiff he needed better pain management and made recommendations

which were sent to the TLC. Dr. Hemphill suggested that if he could get another MRI for

Plaintiff they would have a greater success with TLC in pain management, additional surgeries

and treating the ongoing issues. That MRI was approved but not actually conducted until

December 8, 2016.

57.

On December 19, 2016, Plaintiff was prescribed a wheelchair and Norco three times

daily. Dr. Hemphill recommended Plaintiff see a surgeon after he had reviewed the latest MRI.

2017-2019

58.

On January 12, 2017, Plaintiff was seen by Dr. Zimmerman who advised that surgery

was the only viable option for future pain management. Dr. Zimmerman advised Plaintiff that

surgery to trim the disc off the herniated nerve root at L5/S1 was necessary in addition to

cleaning nerves and fuse some vertebra to bring relief to the L5/S1 area.

59.

During the January 12, 2017 visit, Dr. Zimmerman reviewed the 2013 MRI and one from

2016. He observed a written note from defendants on the 2016 MRI which said "no change" in

condition between the 2013 and 2016 MRI. Dr. Zimmerman commented that this is false noting

that the L4/5 disc had "severe herniation" which was potentially a catastrophic problem and that

it required surgical intervention. Dr. Zimmerman was concerned that ODOC had failed to provide adequate care, pain management or further follow up surgical intervention.

60.

Dr. Zimmerman advised Plaintiff that his back had deteriorated significantly in the last two years due to the lack of care and neglect by ODOC and Dr. Gulick. Dr. Zimmerman opined that surgery would provide some pain relief to Plaintiff and slow down the deterioration process but was not a complete cure.

61.

On May 31, 2017, Plaintiff sent a Notice of Tort Claim for the inadequate and undue delay in treating Plaintiff's back issues, pain management and lack of post-surgical care.

62.

On July 6, 2017, security staff took Plaintiff to the infirmary when Plaintiff demonstrated too much pain to move. Plaintiff received a hot shower, a hot water bottle and was told he was going to see Dr. Gulick. Dr. Gulick never examined Plaintiff. Plaintiff requested a new catheter but was not given one for an extended period of time.

63.

Plaintiff was placed in the SRCI infirmary on June 16, 2018 "until he could walk without a walker or wheelchair". He was advised to do physical therapy 4 times a day despite contrary orders from the outside physicians. SRCI decreased Plaintiff's pain medication. Plaintiff purchased, with his own funds, a brace for his foot and special boots. His right foot has no control and drops such that he cannot walk on it. He was prescribed a foot brace to hold the foot in place but it requires special boots. He was denied the boots which were sent back. The brace broke but SRCI denied him the ability to repair it and he was forced to wear oversized tennis

shoes with the brace. Within a few weeks the tennis shoes were ripped and falling apart from the brace but SRCI and defendants refused to replace them.

64.

In July 2018, Plaintiff was evaluated by a physical therapist who diagnosed him with "drop foot" and recommended an AFO brace. Plaintiff had an ultrasound of his left testicle which revealed he had hydroceles. Plaintiff by this time could no longer completely control his bladder, required catheterization and needed an additional MRI to assess for the recommended surgery by Zimmerman. Defendants removed Plaintiff from Gabapentin which was prescribed to assist Plaintiff with self-awareness of when he needed to void his bladder and to assist with the pain in his testicles. Once Plaintiff was removed from Gabapentin, he began to have episodes of urinary incontinence and could no longer sense when he needed to void his bladder. This creates a high risk of permanent kidney damage.

65.

On May 31, 2018, Plaintiff fell in the shower and in the process both his bowel and bladder evacuated. He was cleaned up by an orderly and security staff, Lt. Mordhurst, who ordered Plaintiff to the infirmary. Plaintiff was released against his wishes one hour later from the infirmary with no effective examination or evaluation. He was not taken to the Emergency Department nor were appointments set up for follow-up care with a physician.

66.

On June 6, 2018, Plaintiff requested he be prescribed Gabapentin but was denied by a nurse who noted only those with Diabetes could have Gabapentin. Plaintiff informed her he had been diagnosed with diabetes several months prior and was receiving Gabapentin for diabetes. He was informed by the nurse there was no "record" of his diagnosis as a diabetic.

67.

On June 6, 2018, Dr. Gulick examined Plaintiff who advised Plaintiff there were no problems with Plaintiff's back including nerve damage or impingement despite several years of contrary MRI findings and conclusions of outside physicians. Dr. Gulick also advised Plaintiff there were no medical problems with the testicles and that if he could not handle main housing he could be housed in the infirmary. Dr. Gulick ordered no new tests or MRIs, and failed to prescribe medications for the numerous various serious medical conditions being suffered by Plaintiff and all contrary to orders from specialists.

68.

On June 12, 2018, Plaintiff lost control of his bowels and bladder soiling his bedding. Lt. Mordhurst obtained new bedding and C/O Brown documented the incident.

69.

On June 13, 2018, Plaintiff was forced to the infirmary at 3:40 pm. He was seen by Ms. Clements and Mr. White who advised Plaintiff his new housing was now the infirmary for several months pending the outcome of certain tests. He was told he would not have access to the legal library. Plaintiff grieved this issue and after 23 days and with the intervention of security staff Plaintiff was once again provided his legal access to the law library.

70.

On July 9, 2018 Plaintiff was seen by Cody Stephens who diagnosed Plaintiff with "drop-foot". The MRI from 2016 was reviewed and according to Stephens, it showed the objective proof of the drop foot. Stephens ordered specific exercises but these were denied by Gulick and the TLC.

71.

On July 23, 2018, Dr. Gulick removed Plaintiff's wheelchair and walker noting that Plaintiff was able to walk on the track. Plaintiff had been walking as suggested by his physical therapist.

72.

On July 25, 2018, Dr. Gulick released Plaintiff from the infirmary. Ms. Clements advised Plaintiff he would no longer be given any pain medication until further testing. On July 31, 2018, Plaintiff had a testicle scan completed.

73.

On August 1, 2018, Mr. White ordered Plaintiff to be restricted from going to the law library. On that same date, Ms. Clements advised Plaintiff that the hydrocele was still present in his testicle but they were not going to treat it. She also advised Plaintiff that a new MRI was being ordered.

74.

On August 3, 2018, Plaintiff fell in the yard but medical refused to come to his aid despite numerous calls from security staff.

75.

On August 4, 2018, Plaintiff was released from the infirmary and was told by defendants that if he called another emergency medical event known as a "man down" he would be sent to the hole and lose all his property, yard and access to the law library.

76.

On August 16, 2018, Ms. Clements conducted a foot pain test with a wire she dug into his left foot with an appropriate response. When she stabbed his foot with the wire in the right foot she received no reflex response at all. No further treatment was offered or scheduled for him.

77.

On September 19, 2018, Plaintiff had another MRI conducted.

78.

On September 25, 2018, Plaintiff was examined by a new doctor, Dr. Koltis who told Plaintiff three different times she "knew what the MRI said" implying Plaintiff would lie to her. She told him it was "hard to diagnose" prisoners and that she did not believe him. Ms. Clements then informed Plaintiff there was further damage to the back and that it is training into the left side with "phantom pains" were, in fact, real pain. Ms. Koltis advised Plaintiff that Ms. Clements had been an advocate in TLC and she would help advocate for him but would not approve any pain medication for him.

79.

On October 18, 2018, Plaintiff went to med line only to learn his two main medications used to control the swelling and discomfort from the testicular pain was discontinued without explanation. Plaintiff was still being denied the boots for the brace he was wearing to address the drop foot issues. Plaintiff's tennis shoes were in shreds and the brace had caused several open sores on his feet.

80.

Between September 2018 and November 27, 2018, Plaintiff was seen by Dr. Harrison who noted he was not competent to perform the surgery for Plaintiff. Plaintiff was then seen by Dr. Little who was willing to perform the surgery. Plaintiff requested transfer to OSP so that he could have access to an evaluation and consultation at Oregon Health Sciences University (OHSU) in Portland.

81.

By November 27, 2108, Plaintiff was seen by an outside doctor for a urology consult. ODOC and defendants herein required Plaintiff to pay for his own consult with the urologist in violation of the Constitution.

82.

By November 2018, Plaintiff had completed all necessary grievances for his lack of medical care, removal of pain management, and the other medical issues which were not being addressed.

83.

By April 2019, Plaintiff was transferred to the Oregon State Penitentiary. He was evaluated at OHSU who advised him he had a "significant back injury" but presently the surgery is too dangerous and there was worry that any after-care would not be well-managed by the ODOC. Plaintiff was advised he will require additional surgeries but they might cause full paralysis. The significant back injury was caused specifically by the delay of timely care by defendants and the failure to monitor and manage the change of symptoms.

84.

Plaintiff presently is not using a wheelchair based on Dr. Gulick's comments to practitioners at OSP. Plaintiff has been restored to some pain management medication and his request for an AFO was granted. Plaintiff is in a single cell and receives some help for his daily needs. His condition continues to worsen and will likely never reverse. It is anticipated that he will be paralyzed at some point in the future.

**FIRST CLAIM FOR RELIEF**: 8th Amendment delay and denial of essential medical care
Dr. Gulick, Ms. Clements and John Does

85.

Plaintiff realleges all previous matters raised herein.

86.

Plaintiff is entitled to be free from cruel and unusual punishment pursuant to the 8th and 14th Amendments of the United States Constitution. This protection includes a right to adequate and timely medical care. This protection extends to pain management. Failure to provide adequate medical care amounts to deliberate indifference to a prisoner's wellbeing and constitutes cruel and unusual punishment in violation of the 8th Amendment. Recklessness with respect to the required standard of care can constitute "deliberate indifference" to a prisoner's medical needs under the 8th Amendment. In this case, Defendants acted with deliberate indifference in failing to respond to Plaintiff's serious medical needs in a continuous uninterrupted fashion from 2010 until the present day.

87.

Plaintiff alleges that the acts and omissions performed by Defendants Gulick, Clements and John Does violated the 8th Amendment standards in the following ways:

a. Defendants Gulick and Clements failed to take appropriate steps to reach a differential diagnosis of the original injury and thereafter failed to take appropriate and medically-sound steps to assess the ongoing and worsening symptoms suffered by Plaintiff;

b. Defendants Gulick and Clements failed to order timely MRIs and to properly respond to those MRIs once obtained;

c. Defendants Gulick and Clements failed to timely order nerve conduction studies of Plaintiff's back and failed to timely respond to the results of those studies once received;

d. Defendants Gulick, Clements and John Does failed to adequately document the signs and symptoms of Plaintiff's ongoing and worsening condition;

e.   Defendants Gulick, Clements and John Does failed to adequately address Plaintiff's ongoing pain management needs;

f.   Defendants Gulick, Clements and John Does failed to order mobility assistance for Plaintiff when he became unable to walk or to manage his own daily needs;

g.   Defendants Gulick, Clements and John Does removed Plaintiff's mobility devices including, without limitation, the wheelchair, the walker, and the AFO foot brace in retaliation for Plaintiff's continual requests for treatment;

h.   Defendants Gulick, Clements and John Does refused to allow Plaintiff to have a foot brace and adequate shoes to wear the foot brace, without medical justification;

i.   Defendants Gulick, Clements and John Does failed to follow the treatment recommendations made by experts, including without limitation, Dr. Zimmerman, Dr. Uhlman, Dr. Belza, Dr. Brewer, Dr. Tien, and Dr. Harrison;

j.   Defendants Gulick, Clements and John Does failed to timely respond to the increasing and worsening symptoms including referral for surgical consult, referral for surgery, referral for post-surgical follow up, referral to have follow-up and regular MRIs, referral for follow-up with a urology expert and to have Plaintiff seen regularly by an expert in spinal cord injuries;

k.   Defendants Gulick, Clements and John Does failed to timely respond to symptoms associated with nerve damage in the spine including the Plaintiff's loss of sensation in the leg, the impingement on nerves causing severe pain in the testicles, the loss of control of the right foot, the inability of Plaintiff to maintain his balance, his repeated falls, his loss of bowel and bladder control, and his nerve pain;

l.   Defendants Gulick, Clements and John Does failed to timely provide updated information on lab and test results to Plaintiff in order to allow Plaintiff to make reasonable informed decisions on his health care including future surgeries;

m.  Defendants Gulick, Clements and John Does arbitrarily determined that Plaintiff "refused" medical care when he exercised his rights for a re-trial when he won his criminal appeal;

n.  Defendants Gulick, Clements and John Does retaliated against Plaintiff by removing his health care and refusing to treat him;

o.  Defendants Gulick, Clements and John Does delayed five years to order the first examination for the spinal injury including recommended surgery, and in that five years, Plaintiff lost sensation in his leg, lost control of his lower extremities, lost control of this bladder and bowel movements, had to be catheterized, developed serious testicular pain and suffered permanent, irreparable damage to his spine;

p.  Defendants Gulick, Clements and John Does failed to provide adequate surgical follow-up after the first surgery, resulting in a monthlong delay in returning and a failure to remove stitches, failed to provide a safe environment to permit adequate healing and ultimately resulting in scar tissue which reversed the benefits of the surgery and necessitated two additional surgeries;

q.  Defendants Gulick, Clements and John Does' delay in treatment, evaluation and rehabilitation for Plaintiff from the first and second surgeries resulted in a worsening of the impingement in the spine, frequent loss of bladder and bowel control, worsening of the foot drop, worsening of mobility, increased need for catheterizations, increased back spasms, and numerous falls;

r.  Defendants Gulick, Clements and John Does' delay in seeking follow-up care from experts for the worsening condition between the second surgery and third surgery resulting in a permanent irreversible damage to Plaintiff's spine which is likely to leave him paralyzed in a few years;

s.  Defendants Gulick, Clements and John Does removed all supportive devices and pain management without medical justification causing several years of pain, incapacity and a lack of mobility inside prison;

t.  Defendants Gulick, Clements and John Does' delay in seeking the third surgery were based on non-medical reasons, were contrived and caused avoidable pain and a worsening of Plaintiff's condition;

u.  Defendants Gulick, Clements and John Does provided false information to Plaintiff on his condition, made false notes on the results of MRIs in 2016 and 2017 and simply stopped seeing Plaintiff for medical conditions related to pain management and his worsening back condition; and

v.  By 2018, Defendants Gulick, Clements and John Does were aware of the significant losses in Plaintiff's spine, the worsening symptoms and the ongoing pain management. They were aware that outside expert providers recommended ongoing MRIs, CT scans, pain management, rehabilitation, restrictions on activities and eventually more surgery to repair all the previous losses caused by the neglect and willful mistreatment of Plaintiff. In response to all this information, these defendants cut off all medical care for the spine issues and sent Plaintiff to the Oregon State Penitentiary with severe, deteriorating spine injuries.

88.

The acts and omissions that evidence deliberate indifference to Plaintiff's serious medical needs caused Plaintiff needless and avoidable pain and immobility, and caused additional exacerbation of his condition which then caused additional problems with incontinence and led to a serious deterioration of the back leading to partial paralysis and foot drop, failed pain management and punitive medical care. The neglectful, deliberate failure to act by Defendants was in the face of repeated objective testing, contrary opinions and orders by outside expert

physicians, and violated the standard of medical care and was a continuous uninterrupted course of medical care between 2006 and the present day.

89.

As a result of the repeated, uninterrupted course of deliberately indifferent medical care arising to intentional withholding of care, Plaintiff suffered a spine injury which could have been easily treated in the beginning but due to the several years of willfully ignoring objective testing, outside opinions and the signs and symptoms demonstrated by Plaintiff, Plaintiff will eventually become paralyzed and will live out his life in pain and discomfort.

90.

As a result of the extraordinary failure to provide timely and adequate medical care by Defendants, Plaintiff has endured the knowledge that the medical staff were deliberately allowing him to become paralyzed, endure excruciating pain and watched his physical condition deteriorate without any intervention or compassion resulting in pain, anxiety, dread, fear and panic by Plaintiff. Plaintiff will likely require future full-time live-in care resulting from the failures by Defendants herein including the failure to provide mobility devices, additional surgeries, handicapped modified living, handicapped modified transportation, and appropriate medications, and will likely become permanently paralyzed. The damages suffered from Plaintiff at the hands of the Defendants will likely cost Plaintiff losses of $7,000,000 for future medical care, live-in care, loss of the ability to earn a living, pain, suffering and dread and likely an early death.

**SECOND CLAIM FOR RELIEF**: Negligence
Individuals Gulick, Clements and John Does

91.

Plaintiff realleges all previous matters as if more fully set forth herein.

92.

Plaintiff has endured medical care which violates the acceptable medical standard of care by the individual treatment providers Gulick, Clements and John Does. It is easily foreseeable that the failures by the Defendants would result in the loss of mobility, the loss of control and sensation in numerous bodily functions and result in paralysis. The individuals may be sued in their individual capacity under the Oregon Tort Claims Act if the alleged losses exceed the present statutory limits.

93.

The named Defendants were negligent in an uninterrupted course of negligent treatment of a serious medical need as follows:

a. Defendants Gulick and Clements failed to take appropriate steps to reach a differential diagnosis of the original injury and thereafter failed to take appropriate and medically-sound steps to assess the ongoing and worsening symptoms suffered by Plaintiff;

b. Defendants Gulick and Clements failed to order timely MRIs and to properly respond to those MRIs once obtained;

c. Defendants Gulick and Clements failed to timely order nerve conduction studies of Plaintiff's back and failed to timely respond to the results of those studies once received;

d. Defendants Gulick, Clements and John Does failed to adequately document the signs and symptoms of Plaintiff's ongoing and worsening condition;

e. Defendants Gulick, Clements and John Does failed to adequately address Plaintiff's ongoing pain management needs;

f. Defendants Gulick, Clements and John Does failed to order mobility assistance for Plaintiff when he became unable to walk or to manage his own daily needs;

g. Defendants Gulick, Clements and John Does removed Plaintiff's mobility devices including, without limitation, the wheelchair, the walker, the AFO foot brace in retaliation for Plaintiff's continual requests for treatment;

h. Defendants Gulick, Clements and John Does refused to allow Plaintiff to have a foot brace and adequate shoes to wear the foot brace, without medical justification;

i. Defendants Gulick, Clements and John Does failed to follow the treatment recommendations made by experts, including without limitation, Dr. Zimmerman, Dr. Uhlman, Dr. Belza, Dr. Brewer, Dr. Tien, and Dr. Harrison;

j. Defendants Gulick, Clements and John Does failed to timely respond to the increasing and worsening symptoms including referral for surgical consult, referral for surgery, referral for post-surgical follow up, referral to have follow-up and regular MRIs, referral for follow-up with a urology expert and to have Plaintiff seen regularly by an expert in spinal cord injuries;

k. Defendants Gulick, Clements and John Does failed to timely respond to symptoms associated with nerve damage in the spine including the Plaintiff's loss of sensation in the leg, the impingement on nerves causing severe pain in the testicles, the loss of control of the right foot, the inability of Plaintiff to maintain his balance, his repeated falls, his loss of bowel and bladder control, and his nerve pain;

l. Defendants Gulick, Clements and John Does failed to timely provide updated information on lab and test results to Plaintiff in order to allow Plaintiff to make reasonable informed decisions on his health care including future surgeries;

m. Defendants Gulick, Clements and John Does arbitrarily determined that Plaintiff "refused" medical care when he exercised his rights for a re-trial when he won his criminal appeal;

n.  Defendants Gulick, Clements and John Does retaliated against Plaintiff by removing his health care and refusing to treat him;

o.  Defendants Gulick, Clements and John Does delayed five years to order the first examination for the spinal injury including recommended surgery, and in that five years, Plaintiff lost sensation in his leg, lost control of his lower extremities, lost control of this bladder and bowel movements, had to be catheterized, developed serious testicular pain and suffered permanent, irreparable damage to his spine;

p.  Defendants Gulick, Clements and John Does failed to provide adequate surgical follow-up after the first surgery, resulting in a monthlong delay in returning and a failure to remove stitches, failed to provide a safe environment to permit adequate healing and ultimately resulting in scar tissue which reversed the benefits of the surgery and necessitated two additional surgeries;

q.  Defendants Gulick, Clements and John Does' delay in treatment, evaluation and rehabilitation for Plaintiff from the first and second surgeries resulted in a worsening of the impingement in the spine, frequent loss of bladder and bowel control, worsening of the foot drop, worsening of mobility, increased need for catheterizations, increased back spasms, and numerous falls;

r.  Defendants Gulick, Clements and John Does' delay in seeking follow-up care from experts for the worsening condition between the second surgery and third surgery resulting in a permanent irreversible damage to Plaintiff's spine which is likely to leave him paralyzed in a few years;

s.  Defendants Gulick, Clements and John Does removed all supportive devices and pain management without medical justification causing several years of pain, incapacity and a lack of mobility inside prison;

t.  Defendants Gulick, Clements and John Does' delay in seeking the third surgery were based on non-medical reasons, were contrived and caused avoidable pain and a worsening of Plaintiff's condition;

u.  Defendants Gulick, Clements and John Does provided false information to Plaintiff on his condition, made false notes on the results of MRIs in 2016 and 2017 and simply stopped seeing Plaintiff for medical conditions related to pain management and his worsening back condition; and

v.  By 2018, Defendants Gulick, Clements and John Does were aware of the significant losses in Plaintiff's spine, the worsening symptoms and the ongoing pain management. They were aware that outside expert providers recommended ongoing MRIs, CT scans, pain management, rehabilitation, restrictions on activities and eventually more surgery to repair all the previous losses caused by the neglect and willful mistreatment of Plaintiff. In response to all this information, these defendants cut off all medical care for the spine issues and sent Plaintiff to the Oregon State Penitentiary with severe, deteriorating spine injuries.

94.

As a result of the negligence by Defendants Gulick, Clements and John Does outlined previously, Plaintiff has suffered permanent loss of bodily functions including bowel and bladder control, loss of functioning in his lower extremities, the ongoing deterioration of his spine which will likely result in at least one or more surgeries and will likely lead to permanent paralysis and early death. Plaintiff will be released from prison in approximately six years unless his present convictions are also overturned. Plaintiff will no longer be physically able to work in the trades as he did prior to prison, will require a live-in health care provider, mobility devices, special-equipment vehicles to accommodate his wheelchair, and will have special needs. The future

economic losses are difficult to assess but could be as much as $4,500,000 over the course of Plaintiff's life.

95.

Plaintiff also has suffered long-standing abuses by medical staff who arbitrarily removed medications, assistive devices, denied Plaintiff's access to legal services, and failed to provide timely evaluations and treatment which created a deep fear and dread in Plaintiff knowing that none of the medical staff cared whether he lived or died. Plaintiff did not have access to his own medical treatment providers and was forced to accept the lack of adequate care by defendants herein. Plaintiff alleges he suffered non-economic damages of $2,500,000.

**THIRD CLAIM FOR RELIEF**: State of Oregon
Injunctive Relief

96.

Plaintiff realleges all matters previously raised herein as if more fully set forth.

97.

Plaintiff is entitled to seek injunctive, declaratory and protective relief in cases brought pursuant to 42 U.S.C. § 1983. Plaintiff may bring such claims against the state without raising concerns of sovereign immunity.

98.

Plaintiff is entitled to timely, humane medical care which, at least, meets the community standard of care for similar medical conditions. Plaintiff is also entitled to medical care based on evaluations of expert medical providers and as dictated by community standards. In this case Plaintiff has been denied timely medical evaluations and timely objective testing, and has been denied access to outside experts for long periods of time which has resulted in permanent irreversible spinal damage. Plaintiff has also been denied standard-of-care pain management

treatment, has been lied to about his condition and the results of tests, and has been subjected to retaliatory treatment as a result of seeking care and filing litigation by medical staff.

99.

As part of the damages sought in this litigation, Plaintiff seeks orders from the Court commanding the State of Oregon as follows:

1. Have Plaintiff evaluated by a neutral outside medical expert in urology, neurology and endocrinology at the Defendants' expense. The outside experts shall be agreed upon by both parties;

2. Have the outside medical evaluators create a medical treatment plan to address the ongoing pain management issues, the ongoing deterioration of the spine and resulting mobility issues, and any and all physical rehabilitation issues, and to recommend ongoing outside evaluation and testing and the timeline for that testing;

3. Orders to ODOC to follow the treatment plan developed by the outside panel;

4. Have the ODOC practitioners who treat Plaintiff provide ongoing status reports on Plaintiff's progress or lack thereof to Plaintiff and his counsel, and to explain why certain procedures will not be implemented if ordered by the outside panel;

5. Have the ODOC practitioners provide electronic versions of all medical charts from within ODOC and outside providers every three months to Plaintiff, his counsel and/or his medical designee;

6. Have the outside panel of experts develop a treatment plan for Plaintiff's release from prison;

7. Have ODOC provide a safe and accessible single living cell for Plaintiff while at OSP and to keep Plaintiff at OSP throughout his incarceration unless some serious issue

develops. ODOC shall under no circumstances move or transport Plaintiff to a different prison without court approval; and

8. Have ODOC provide, at state expense, all assistive devices recommended by the outside panel to Plaintiff including, without limitation, wheelchairs, walkers, accessible showers and toilets, and a caregiver/orderly to assist with all daily living needs until Plaintiff is released from prison.

WHEREFORE Plaintiff prays for relief:

1. Findings that the individual Defendants violated the 8th Amendment duties to provide timely and adequate medical care to Plaintiff;

2. Findings that as a result of the Constitutional violations herein, Plaintiff is entitled to a judgment in an amount of $7,000,000 for economic and non-economic damages;

3. Findings that as a result of the negligence of the defendants herein Plaintiff suffered economic damages in an amount of $4,500,000 and non-economic damages of $2,500,000;

4. Findings that there are ongoing harms and losses suffered by Plaintiff necessitating the provisional relief sought herein until Plaintiff releases from prison; and

5. Findings that Plaintiff is entitled to attorney fees and costs.

Dated this 12th day of April 2019.

Respectfully submitted,


/s/Michelle R. Burrows
Michelle R. Burrows OSB86160
Attorney for Plaintiff